GREGORY A. KASPER
kasperg@sec.gov
JODANNA L. HASKINS (*pro hac vice* application forthcoming)
haskinsjo@sec.gov
IAN J. KELLOGG (*pro hac vice* application forthcoming)
kelloggi@sec.gov
SECURITIES AND EXCHANGE COMMISSION
1961 Stout Street, 17th Floor
Denver, Colorado 80294
(303) 844-1000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> - against – <br><br> PAUL D. ROBERTS, <br><br> Defendant. | **Case No. 24-cv-6990** <br><br> **COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission (the "SEC" or "Commission"), for its Complaint against defendant Paul D. Roberts ("Roberts" or "Defendant"), alleges as follows:

**SUMMARY**

1.      Roberts, the former President, Interim Chief Executive Officer ("CEO"), and Chairman of Kubient Inc. ("Kubient"), engaged in a scheme to fraudulently inflate Kubient's 2020 revenue in advance of a planned initial public offering ("IPO"). Roberts touted the phony revenue and asserted that it demonstrated that Kubient's flagship product, Kubient Artificial Intelligence ("KAI"), was successful. Based on the phony revenue and Roberts's claims of KAI's success, unsuspecting investors poured over $30 million into Kubient.

2.      In reality, Kubient's use of KAI, a product that purportedly detects real-time fraud during digital advertising auctions, had not generated any meaningful revenue. Roberts fabricated fraud analyses that he claimed were prepared by KAI for two customers as part of a

1

beta test despite Kubient not even obtaining the customers' data to analyze. Roberts further claimed that Kubient received over $1.3 million in "revenue" for analyzing the customers' data when, in fact, Kubient never performed the analyses to generate revenue.

3.    Roberts then lied to Kubient's independent auditor concerning the revenue at issue and whether he was aware of any risks relating to the company's revenue, allowing Kubient to continue to rely on its claims of the success of the KAI tests and phony revenue in offering materials and in its Form 10-K for 2020.

## NATURE OF THE PROCEEDINGS AND REQUESTED RELIEF

4.    The SEC brings this action pursuant to the authority conferred on it by Section 20(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b)] and Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d)]. The SEC seeks a permanent injunction against Roberts, enjoining him from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint and from violating, directly or indirectly, the laws and rules alleged in this Complaint; disgorgement of all ill-gotten gains from the unlawful activity set forth in this Complaint, together with prejudgment interest; civil penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)]; and an officer and director bar pursuant to the Court's equitable authority, Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)].

## JURISDICTION AND VENUE

5.    This Court has subject matter jurisdiction pursuant to Securities Act Sections 20(b), 20(d), 20(e), and 22(a) [15 U.S.C. Sections §§ 77t(b), 77t(d), 77t(e), and 77v(a)] and Exchange Act Sections 21(d), 21(e), and 27(a) [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

6.      Roberts, directly or indirectly, made use of the means or instrumentalities of interstate commerce, or of the mails, or the facilities of a national securities exchange in connection with the acts, practices, transactions, and courses of business alleged in this Complaint.

7.      Venue lies in this Court pursuant to Sections 21(d) and 27 of the Exchange Act [15 U.S.C. § 78u(d) and 78aa]. Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within the Southern District of New York, Roberts transacted business in this District, and he worked for Kubient, which at all relevant times had its principal place of business within this judicial district in New York, New York.

## DEFENDANT

8.      **Paul D. Roberts**, age 47, is a resident of Melville, New York. He served as Kubient's Chief Strategy Officer, President, and Chairman beginning on approximately May 15, 2019. On October 31, 2020, Roberts became Kubient's Interim CEO. On December 16, 2021, Roberts was made CEO. Roberts resigned as Chairman and CEO/President on September 22, 2023, and November 2, 2023, respectively.

## RELATED ENTITY

9.      **Kubient, Inc.** is a Delaware corporation based in New York, New York. Kubient's common stock is registered with the Commission under Section 12(b) of the Exchange Act. Kubient was quoted on the NASDAQ Capital Market under the ticker symbol "KBNT" beginning on August 12, 2020, until it was delisted on November 17, 2023. Unsolicited quotations for Kubient's common stock are currently quoted on OTC Link.

## FACTUAL ALLEGATIONS

### I. Kubient and KAI

10.     During the relevant period, Kubient was a technology company that provided services to the digital advertising industry via a cloud-based software platform.

11.     According to Kubient, its flagship product KAI detected fraud when companies were buying or selling advertisements on digital platforms, such as Google. These purchases were typically made during real-time auctions for that digital ad space. As digital advertising is typically priced by how often the advertisement is viewed, KAI purported to detect when those views are not by humans but by software programs designed and implemented to inflate those views to increase the price of the advertising.

### II. Kubient's IPO and Secondary Offering

12.      Kubient engaged in two securities offerings—the IPO took place in August 2020 and the second public offering took place in December 2020.

#### A. IPO

13.     The offering materials for Kubient's IPO included an S-1 registration statement and prospectus ("IPO Offering Materials"). The final IPO Offering Materials were filed and made effective on August 11, 2020.

14.     Kubient raised approximately $12.5 million as a result of its IPO.

#### B. Secondary Offering

15.     Beginning on December 22, 2020, approximately four months after its IPO, Kubient conducted a secondary offering of its common stock.

16.    The offering materials for Kubient's secondary offering included an S-1 registration statement and prospectus (the "Secondary Offering Materials"). The Secondary Offering Materials were filed on December 21, 2020, and made effective on December 22, 2020.

17.    Kubient raised approximately $20.7 million as a result of its secondary offering.

### III. Roberts Engaged in Deceptive Acts and Practices to Falsely Inflate KAI Revenue, Resulting in Kubient Recognizing Improper Revenue.

18.    Roberts engaged in deceptive acts and practices to falsely inflate KAI revenue by instructing Kubient employees to fabricate KAI fraud analysis reports; instructing Kubient's former Chief Financial Officer ("CFO") to send the fabricated fraud analysis reports to Kubient's independent auditor; and causing Kubient to record $1.3 million in revenue despite knowing the performance obligations associated with that revenue had not been satisfied.

19.    Prior to the first quarter of 2020, Kubient had not generated any meaningful revenue from KAI. By late 2019, running short of funds and Kubient's efforts to attract investment from private equity funds failing, Kubient planned to offer shares to the public through an IPO. For the IPO to be as successful as possible, Kubient needed to show that KAI worked effectively in detecting fraud and that there was interest in and revenue from the product.

20.    In or about the fourth quarter of 2019, Kubient entered into transactions with two customers (collectively, the "Customers") whereby (1) Kubient would provide a KAI "beta test" fraud analysis to each of the Customers for a total of $1.3 million (the "KAI Deal"), and (2) the Customers would sell data to Kubient for approximately the same dollar amount.

### A. Kubient Did Not Perform Under the KAI Deal and Roberts Engaged in Deceptive Conduct to Hide Kubient's Failure to Perform.

21.    The contract for the KAI Deal provided that the Customers would transfer data to Kubient, Kubient would scan that data with KAI, and Kubient would then provide KAI fraud

analysis reports (the "KAI Reports") to the Customers. However, none of these contractual obligations were performed because the Customers never provided Kubient with data for a KAI analysis.

22.     In the first quarter of 2020, Kubient recorded $1.3 million in revenue for the KAI Deal, constituting nearly all of Kubient's revenue that quarter, and approximately 95% of the company's revenue at the time of its IPO in August 2020. Because the Customers never provided any data for Kubient to scan, and Kubient had not in fact performed the work contracted for, revenue should not have been recognized.

23.     Roberts knew or was reckless in not knowing, and should have known, that none of the performance obligations set forth in the contract for the KAI Deal were satisfied.

24.     During the first quarter of 2020, the CFO asked Roberts for the KAI Reports to provide to the independent auditor to support the revenue.

25.     In response, Roberts created fictitious KAI reports to support Kubient's revenue. To do so, he first instructed a Kubient employee ("Employee 1") to create two electronic folders—named for the Customers—under the pretext of creating a "sample." Roberts did not provide Employee 1 with any Customer data but told Employee 1 to populate the folders with "our own data." Employee 1 did so, inserting existing data from other Kubient customers into the folders.

26.     Roberts instructed another Kubient employee ("Employee 2") to create "sample" KAI reports, indicating that the reports would be shown to bankers during the company's upcoming IPO road show.

27.     Roberts then provided Employee 2 with the information he wanted the employee to plug into the "sample" KAI reports, including the amount of fraud KAI had purportedly detected.

28.     Employee 2 asked Roberts for the data to be analyzed by KAI. In response, Roberts told Employee 2 that there was no actual data to be analyzed and reiterated that these were simply "sample" reports.

29.     Employee 2 created the "sample" KAI Reports, as directed by Roberts, and sent them to Roberts on March 24, 2020.

30.     On March 25, 2020, the day after Employee 2 sent Roberts the KAI Reports they had prepared, Roberts emailed the reports to the CFO to provide to the independent auditor as support for the $1.3 million in revenue from the KAI Deal.

31.     In reviewing the KAI Reports, the CFO noticed the quantity of data that had been allegedly analyzed differed from the quantity of data for which the Customers had been invoiced the previous quarter. Instead of inquiring further about the discrepancy, the CFO asked Roberts if the CFO should change the numbers reflecting the quantity of data analyzed in the KAI Reports to match the numbers in the invoices, to which Roberts replied "yes."

32.     As agreed to with Roberts, the CFO then changed the KAI Reports before emailing these reports, in addition to the underlying KAI Deal contract and invoices, to the independent auditor, copying Roberts.

**B.  A Kubient Employee Raised Questions about the KAI Deal Revenue, and Roberts Again Engaged in Deceptive Conduct to Conceal the Improperly Recognized Revenue.**

33.     On December 22, 2020, a high-level Kubient employee who co-developed KAI ("Employee 3") discovered that the data purportedly provided by the Customers for the KAI

Deal did not originate from the Customers. After opening the electronic folders containing the data that was supposed to be analyzed in connection with the KAI Deal, Employee 3 discovered that the data originated from other Kubient customers.

34.    That same day, Employee 3 reported his findings to Kubient's Audit Committee Chair ("AC Chair"). During Employee 3's conversation with the AC Chair, Employee 3 advised the AC Chair that Kubient had not scanned any of the Customers' data, that the folders purportedly holding the Customers' data contained data from other Kubient customers, and questioned whether Employee 3's discovery could be the result of fraud.

35.    The AC Chair then discussed the issue with Roberts as well as the CFO and Kubient's outside securities counsel.

36.    As a result, Roberts called a representative of the Customers on December 23, 2020.

37.    On December 28, 2020, after being asked by the CFO for an update on "last week's fiasco," Roberts told the CFO he had a "solution in place" and would send an email shortly.

38.    On December 29, 2020, Roberts sent an email to the Customers (copying the CFO) stating, in relevant part:

> During a recent internal review, we discovered that the data used during [our fraud prevention] test may not have originated from [you]. I apologize for this and would like to offer a solution that satisfies you and your team. Kubient can retest your data using KAI at no cost as per the agreement terms or offer any suitable solution you can provide. Please let me know how you would like to proceed.

39.    Later that day, the Customers responded as follows:

> After connecting with the team internally, everyone agreed that during those 90-days we received a ton of value from your team. We

all appreciate the offer to rescan our traffic, however we are very
satisfied with west [sic] we received . . . .

**C.  Revenue is Improperly Recognized.**

40.     In the first quarter of 2020, Kubient recognized $1.3 million in revenue based on

the KAI Deal. That revenue was reflected in financial statements included in Kubient's second

and third quarter 2020 Forms 10-Q, 2020 Form 10-K, and IPO and Secondary Offering

Materials. The improper revenue was also reported in Kubient's earnings releases and associated

Forms 8-K, and earnings calls for the second and third quarters of 2020 as well as year-end 2020.

41.     The $1.3 million in revenue should not have been recognized because the

performance obligations for the KAI Deal were not performed in accordance with the applicable

accounting standard for revenue recognition: Financial Accounting Standards Board ("FASB")

Accounting Standards Codification ("ASC") Topic 606, *Revenue from Contracts with Customers*

("ASC 606").  As such, the recognized revenue was not in conformity with Generally Accepted

Accounting Principles ("GAAP").

42.     In a memo provided to the independent auditor in May 2020, justifying Kubient's

accounting treatment of the revenue from the KAI Deal, the CFO, relying on false information

provided by Roberts, confirmed Kubient received the data from the Customers.

43.     Roberts knew or was reckless in not knowing, and should have known, that the

revenue should not have been recognized.

44.     The revenue recorded from the KAI Deal was material as it constituted nearly all

of Kubient's revenue for the first quarter of 2020, approximately 95% of the company's revenue

at the time of its IPO in August 2020, and approximately 45% of the company's 2020 annual

revenue. Moreover, it is likely the IPO would not have been underwritten had the underwriter

known about the fraudulent KAI Deal revenue.

**IV. False and Misleading Statements in Offering Materials and Filings.**

    **A. Kubient, Aided and Abetted by Roberts, Made False and Misleading Statements Prior to Kubient's IPO.**

45.    After fraudulently recognizing revenue from the KAI Deal in the first quarter of 2020, Kubient spent the next several months preparing for its IPO.

46.    At the time of Kubient's IPO in August 2020, Roberts served as Kubient's Chief Strategy Officer, President, and Chairman.

47.    In those roles, Roberts reviewed, approved, and, at least in part, drafted the IPO Offering Materials filed on August 11, 2020, which contained numerous false statements.

48.    The IPO Offering Materials highlighted Kubient's $1.3 million successful sale and "beta test" of its KAI product to the Customers.

49.    Kubient's IPO Offering Materials, filed on August 11, 2020, provided, in relevant part:

> During the quarter ended March 31, 2020, we allowed two large enterprise clients to beta test KAI in a live isolated environment. Kubient was able to successfully ingest hundreds of millions of rows of data in real-time and provide our clients the ability to prevent the purchase of non-human or fraudulent advertising traffic. The results from the two beta clients indicated that KAI was identifying and preventing approximately 300% more digital ad fraud than the clients' current partners. The large volume of data ingested helped to improve our proprietary algorithms including the supervised and unsupervised version. This was invaluable as it provided us an opportunity to stress test our ability to handle large scale, concurrent input of data into our system which is then analyzed using our patent-pending proprietary machine learning technology. . . .

50.    Kubient made similar false statements in other sections of its IPO Offering Materials. For example, in a section addressing net revenues Kubient stated:

> For the three months ended March 31, 2020, net revenues increased by $1,325,107, or 2,333%, to $1,381,913 from $56,806 for the three months ended March 31, 2019. This increase was primarily due to

> approximately $1,300,000 of revenue generated in connection with
> beta testing of KAI, our fraud detection service, which commenced
> during the 2020 period . . . .

51.     A reasonable investor would have understood from these statements that Kubient had successfully tested KAI using the Customers' data and that the successful beta test yielded $1.3 million in revenue for Kubient.

52.     The statements in the IPO Offering Materials identified above were false and misleading because the Customers never provided any data to Kubient, Kubient never scanned any of the Customers' data through KAI, and the $1.3 million in purported revenue was improperly recognized.

53.     The statements in the IPO Offering Materials identified above were false and misleading when made and Roberts knew or was reckless in not knowing, and should have known, that the statements were false and misleading because he was aware that no data had been provided by the Customers, that no data had been scanned by KAI, that the fraud analysis reports were fake, and that the $1.3 million in purported revenue was improperly recognized.

54.     The false and misleading statements in the IPO Offering Materials identified above were material to a reasonable investor because the KAI Deal revenue constituted nearly all of Kubient's revenue for the first quarter of 2020, approximately 95% of the company's revenue at the time of its IPO in August 2020, and approximately 45% of the company's 2020 annual revenue. Moreover, it is likely the IPO would not have been underwritten had the underwriter known about the fraudulent KAI Deal revenue.

55.     As a result of its IPO, Kubient raised approximately $12.5 million from investors.

56.     Roberts aided and abetted Kubient's false and misleading statements violations by providing substantial assistance through the conduct described above.

**B. Kubient, Aided and Abetted by Roberts, Made False and Misleading Statements in Kubient's Second Quarter Report and Form 8-K Filing After the Kubient IPO.**

57.    Following its IPO, Kubient filed a quarterly report for the second quarter of 2020, on September 24, 2020, that fraudulently reported the $1.3 million from the KAI Deal as revenue in the financial statements.

58.    In addition, Kubient's second quarter report falsely stated:

> During the . . . [foregoing six-month period], the Company recognized revenue in connection with contracts to scan a customers' [sic] first-party anonymized data with KAI. Upon completion of the scan, the Company delivered a report to the customer, which is the point in time the Company satisfied the performance obligation . . . During the . . . [foregoing periods], the Company recognized aggregate revenue of $0 [sic] and $1,300,338, respectively, in connection with the contracts.

59.    The second quarter report also falsely stated:

> In addition, during the [relevant period], we allowed two clients to beta test KAI, our fraud prevention technology powered by machine learning. This testing was invaluable as it provided us an opportunity to stress test our ability to handle large scale, concurrent input of data into our system which is then analyzed using our patent-pending proprietary machine learning technology. We were able to successfully ingest hundreds of millions of rows of data in real-time and provide our clients the ability to prevent the purchase of non-human or fraudulent advertising traffic, which will lead to additional improvements to our technology. While KAI was monetized in the first quarter during beta testing, it was made available as a stand-alone enterprise in the third quarter of 2020.

60.    The second quarter report also falsely stated:

> For the six months ended June 30, 2020, net revenues increased by $1,367,494, or 1,291%, to $1,473,450 from $105,956 for the six months ended June 30, 2019. The increase was primarily due to approximately $1,300,000 of revenue generated in connection with beta testing of KAI, our fraud detection service[.]

61.    Kubient also fraudulently reported the $1.3 million in revenue from the KAI Deal in an earnings release included with its Form 8-K filing on September 23, 2020.

62.     A reasonable investor would have understood from these financial statements and Form 8-K that KAI yielded $1.3 million in revenue for Kubient.

63.     The statements in the second quarter report and Form 8-K were false and misleading because the Customers never provided any data to Kubient, Kubient never scanned any of the Customers' data through KAI, and the $1.3 million in purported revenue was improperly recognized.

64.     The statements in the second quarter report and the Form 8-K were false and misleading when made and Roberts knew or was reckless in not knowing, and should have known, that these statements were false and misleading because he was aware that no data had been provided by the Customers, that no data had been scanned by KAI, that the fraud analysis reports were fake, and that the $1.3 million in purported revenue was improperly recognized.

65.     The false and misleading statements in the second quarter report and the Form 8-K were material to a reasonable investor because the KAI Deal revenue constituted nearly all of Kubient's revenue for the first quarter of 2020, approximately 95% of the company's revenue at the time of its IPO in August 2020, and approximately 45% of the company's 2020 annual revenue.

66.     Roberts aided and abetted Kubient's false and misleading statements violations by providing substantial assistance through the conduct described above.

**C. Kubient and Roberts Made False and Misleading Statements in Kubient's Third Quarter Report and Form 8-K Filing After the Kubient IPO.**

67.     On October 31, 2020, Roberts was appointed Interim CEO of Kubient.

68.     In that role, Roberts signed the quarterly report for the third quarter of 2020, which Kubient filed on November 13, 2020. As a signer of the filings, and Interim CEO, Roberts

had the ultimate authority over the statements, including their content and whether and how to communicate them.

69.    The third quarter report fraudulently reported the $1.3 million from the KAI Deal as revenue in the financial statements.

70.    In addition, Kubient's third quarter report  falsely stated:

> During the . . . [foregoing nine-month period], the Company recognized revenue in connection with contracts to scan a customers' [sic] first-party anonymized data with KAI. Upon completion of the scan, the Company delivered a report to the customer, which is the point in time the Company satisfied the performance obligation . . . . During the . . . [foregoing periods], the Company recognized aggregate revenue of $0 [sic] and $1,300,338, respectively, in connection with the contracts.

71.    The third quarter report also falsely stated:

> In addition, during the [relevant period], we allowed two clients to beta test KAI, our fraud prevention technology powered by machine learning. This testing was invaluable as it provided us an opportunity to stress test our ability to handle large scale, concurrent input of data into our system which is then analyzed using our patent-pending proprietary machine learning technology. We were able to successfully ingest hundreds of millions of rows of data in real-time and provide our clients the ability to prevent the purchase of non-human or fraudulent advertising traffic, which will lead to additional improvements to our technology. While KAI was monetized in the first quarter during beta testing, it was made available as a stand-alone enterprise in the third quarter of 2020.

72.    The third quarter report similarly falsely stated:

> For the nine months ended September 30, 2020, net revenues increased by $1,592,023, or 984%, to $1,753,851 from $161,828 for the nine months ended September 30, 2019. The increase was primarily due to approximately $1,300,000 of revenue generated in connection with beta testing of KAI, our fraud detection service, which commenced during the 2020 period[.]

73.    Kubient also fraudulently reported the $1.3 million in revenue from the KAI Deal in an earnings release included with its Form 8-K filing on November 13, 2020.

74.    A reasonable investor would have understood from the third quarter report and Form 8-K that KAI yielded $1.3 million in revenue for Kubient.

75.    The statements in the third quarter report and Form 8-K were false and misleading because the Customers never provided any data to Kubient, Kubient never scanned any of the Customers' data through KAI, and the $1.3 million in purported revenue was improperly recognized.

76.    The statements in the third quarter report and the Form 8-K were false and misleading when made and Roberts knew or was reckless in not knowing, and should have known, that these statements were false and misleading because he was aware that no data had been provided by the Customers, that no data had been scanned by KAI, that the fraud analysis reports were fake, and that the $1.3 million in purported revenue was improperly recognized.

77.    The false and misleading statements in the third quarter report and the Form 8-K were material to a reasonable investor because the KAI Deal revenue constituted nearly all of Kubient's revenue for the first quarter of 2020, approximately 95% of the company's revenue at the time of its IPO in August 2020, and approximately 45% of the company's 2020 annual revenue.

**D.  Kubient and Roberts Made False and Misleading Statements in Connection with Kubient's Secondary Offering.**

78.    During the secondary offering, following Roberts' appointment as Interim CEO, Kubient and Roberts continued to tout the success of the KAI beta test and improperly recognize $1.3 million from the KAI Deal in financial statements and offering materials.

79.    Kubient's Secondary Offering Materials and 2020 Form 10-K were signed by Roberts, who stated that the $1.3 million in revenue reported in 2020 had been generated from a highly successful beta test of KAI. As a signer of the filings, and Interim CEO, Roberts had the

ultimate authority over the statements, including their content and whether and how to communicate them.

80.    These statements were false and misleading because a beta test of KAI never occurred, nor could it have occurred because the Customers never provided data to Kubient to scan through KAI, and the $1.3 million in purported revenue was improperly recognized.

81.    The statements in the Secondary Offering Materials and 2020 Form 10-K were false and misleading when made, and Roberts knew or was reckless in not knowing, and should have known, that these statements were false and misleading because he knew a beta test of KAI never occurred, nor could it have occurred because the Customers never provided data to Kubient to scan through KAI, and the $1.3 million in purported revenue was improperly recognized.

82.    These false and misleading statements were material to investors because a reasonable investor would have understood from these statements in Kubient's Secondary Offering Materials and 2020 Form 10-K that Kubient had successfully tested KAI with the Customers, and that the successful beta test yielded $1.3 million in revenue for Kubient.

**E. Roberts Made, or Aided and Abetted Kubient's Making of, the Statements Identified Above, and Kubient and Roberts Obtained Money or a Financial Benefit from the False and Misleading Statements.**

83.    For each of the statements identified above in Section IV(A) and (B), Roberts aided and abetted Kubient's false and misleading statements violations of Exchange Act Section 10(b) and Rule 10b-5(b) thereunder by providing substantial assistance through the conduct described above.

84.    For each of the statements identified above in Section IV(C) and (D), Roberts reviewed, approved, and, at least in part, drafted, and/or signed the documents containing the statements, and as the Interim CEO and Chairman had ultimate authority over the documents.

85.    Kubient and Roberts, directly or indirectly, each obtained money or a financial benefit from the statements identified above. As described above, Kubient raised approximately $33 million from its IPO and secondary offering. In addition, Kubient obtained a financial benefit during the relevant period from issuing stock and warrants at prices that were artificially inflated from the fraudulent conduct.

86.    Further, Kubient awarded Roberts cash bonuses which Kubient described as follows: "(i) a $250,000 cash bonus related to Mr. Robert's [sic] efforts in connection with the Company's IPO, (ii) a $250,000 cash bonus in related to Mr. Robert's [sic] efforts in connection with the Company's follow-on offering, and (iii) a $90,000 contractual annual performance bonus." Kubient awarded the $90,000 bonus "in connection with [his] performance during 2020[.]"

## V.  Roberts Made Misrepresentations to Kubient's Auditors.

87.    Kubient hired an independent auditor to conduct an audit for Kubient's 2020 fiscal year.

88.    In connection with that audit, Roberts made, or caused to be made, materially false or misleading statements and/or omissions of material facts to the independent auditor in violation of Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2].

89.    On March 25, 2020, Roberts caused materially false statements to be made to the independent auditor in connection with Kubient's IPO by causing fabricated KAI Reports to be provided to the independent auditor to support the fraudulent revenue reported throughout 2020.

90.     Further, on March 29, 2021, Roberts falsely represented in Kubient's 2020 fiscal year management representation letter to the independent auditor:

    a.    that the 2020 financial statements were fairly presented in conformity with GAAP;

    b.    that he was not aware of any risks that the financial statements may be materially misstated as a result of fraud; and

    c.    that he had not received any communications, nor did he have knowledge of, any fraud, allegations of fraud, or suspected fraud that could have a material effect on the financial statements.

91.     Each of these statements was false when made because Roberts knew the $1.3 million in purported revenue from the KAI Deal had been improperly recognized as the beta test on which that revenue was based never took place.

## VI. Roberts Falsified Kubient's Books, Records and/or Accounts.

92.     Roberts knowingly circumvented a system of internal accounting controls and knowingly falsified, or caused to be falsified, Kubient's books, records, and/or accounts in violation of Exchange Act Section 13(b)(5) [15 U.S.C. §78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. §§ 240.13b2-1].

93.     Roberts knowingly recorded and/or caused to be recorded on Kubient's books $1.3 million in revenue that was not in conformity with GAAP.

## VII. Roberts Aided and Abetted Kubient's Books and Records Violations.

### A.  Kubient Made False SEC Filings.

94.     Kubient, through Roberts and others, filed current, quarterly, and/or annual reports with the SEC that made material false statements and/or omitted material information

necessary to make the statements therein not misleading in violation of Exchange Act Section 13(a) [15 U.S.C. §78m(a)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20 and 240.13a-1].

95.    Kubient's Forms 10-Q for the second and third quarters of 2020 and the financial statements included therein, and its Forms 8-K, filed on September 23, 2020, and November 13, 2020, that included earnings releases for those quarters, materially overstated the company's revenue by reporting $1.3 million in improper revenue from the KAI Deal.

96.    Kubient's 2020 Form 10-K and the financial statements contained therein similarly materially overstated the company's revenue and made material misrepresentations about the KAI Deal.

97.    In addition, Kubient's Form 8-K filed on March 25, 2021, that included as an exhibit its 2020 year-end earnings release, materially overstated the company's revenue.

**B.  Kubient Maintained False Books and Records.**

98.    Kubient, through Roberts and others, failed to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected Kubient's transactions in violation of Exchange Act Section 13(b)(2)(A) [15 U.S.C. § 78m(b)(2)(A)].

99.    Kubient's books and records reflected $1.3 million in improper revenue.

100.    Kubient, through Roberts and others, failed to document the circumstances and conclusion surrounding Kubient scanning the wrong data, the subsequent communication and resolution with the Customers, and the resulting impact on revenue recognition.

**C.   Kubient Knowingly Circumvented Accounting Controls.**

101.    By directing, recording, and/or facilitating the improper recognition of $1.3 million in revenue during 2020, Kubient, through Roberts and others, knowingly circumvented

the company's internal controls in violation of Exchange Act Section 13(b)(2)(B)(ii) [15 U.S.C.

§ 78m(b)(2)(B)(ii).].

102.    In addition, Kubient did not have an adequate system of internal accounting

controls to ensure that revenue and assets were properly evaluated, supported, and recorded.

103.    In addition to fabricating the supporting documentation for the improper KAI

Deal revenue before it was provided to the independent auditor, Roberts misrepresented and/or

omitted material information to the independent auditor about the fraudulent revenue, including

representing that he was not aware of any improper or fraudulent accounting practices at the

company and had made all relevant information available to the Independent Auditor.

**D.  Roberts Aided and Abetted the Violations of Kubient.**

104.    Roberts aided and abetted Kubient's books and records violations by providing

substantial assistance through the conduct described above.

**VIII.  Roberts Falsely Certified that Kubient's Periodic Filings Fairly Presented the Financial Condition and Results of the Company.**

105.    Roberts signed Kubient's third quarter 2020 Form 10-Q certification on

November 13, 2020, and Kubient's 2020 Form 10-K certification on March 29, 2021, both of

which materially overstated Kubient's revenue, and falsely certified that that those filings fairly

presented, in all material respects, the financial condition and results of operation of the company

in violation of Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14].

## FIRST CLAIM FOR RELIEF
**Fraud in the Offer or Sale of Securities – Violations of Securities Act Section 17(a)**

106.    The Commission realleges and incorporates by reference paragraphs 1 through

105, as though fully set forth herein.

107.    By virtue of the foregoing, Defendant, directly or indirectly, in the offer or sale of a security by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails:

        (a)     employed a device, scheme, or artifice to defraud;

        (b)     obtained money or property by means of an untrue statement of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

        (c)     engaged in a transaction, practice, or course of business which operated or would operate as a fraud or deceit upon the purchaser.

108.    Defendant engaged in this conduct intentionally, knowingly, or with severe recklessness.

109.    Accordingly, Defendant, directly or indirectly, violated, and unless restrained and enjoined will again violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

<u>**SECOND CLAIM FOR RELIEF**</u>
**Fraud – Violation of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**

110.    The Commission realleges and incorporates by reference paragraphs 1 through 109, as though fully set forth herein.

111.    By engaging in the conduct described above, Defendant, directly or indirectly, knowingly or recklessly, in connection with the purchase or sale of securities, directly or indirectly, by use of the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange:

        (a)     employed devices, schemes or artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

(c)     engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

112.    Accordingly, Defendant, directly or indirectly, violated and unless enjoined will again violate, Exchange Act Section 10(b) [15 U.S.C § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### THIRD CLAIM FOR RELIEF
**Fraud – Aiding and Abetting Kubient's Violation of Exchange Act Section 10(b) and Rule 10b-5(b) Thereunder**

113.    The Commission realleges and incorporates by reference paragraphs 1 through 112, as though fully set forth herein.

114.    By virtue of the foregoing, Roberts provided knowing and substantial assistance to Kubient, who, directly or indirectly, knowingly or recklessly, by use of the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange, in connection with the purchase or sale of a security: made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

115.    Accordingly, Roberts aided and abetted and, unless restrained and enjoined, will again aid and abet, the violations of Section 10(b) [15 U.S.C. § 78j(b)] of the Exchange Act and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

## FOURTH CLAIM FOR RELIEF
### Material False Statements and/or Omissions of Material Fact to an Accountant – Violation of Exchange Act Rule 13b2-2

116.    The Commission realleges and incorporates by reference paragraphs 1 through 115, as though fully set forth herein.

117.    By virtue of the foregoing, Defendant, directly or indirectly:

(a)    Made or caused to be made a materially false or misleading statement to an accountant or

(b)    Omitted to state, or caused another person to omit to state, any material fact necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with, among other things, a required audit, review or examination of the issuer's financial statements or the preparation or filing of any document or report required to be filed with the Commission.

118.    Accordingly, Defendant violated, and unless restrained and enjoined will again violate, Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2].

## FIFTH CLAIM FOR RELIEF
### Falsified Books, Records or Accounts – Violations of Exchange Act Section 13(b)(5) and Rule 13b2-1 Thereunder

119.    The Commission realleges and incorporates by reference paragraphs 1 through 118, as though fully set forth herein.

120.    By virtue of the foregoing, Defendant:

(a)    knowingly circumvented or knowingly failed to implement a system of internal accounting controls; and

(b)      knowingly falsified, or caused to be falsified, Kubient's books, records, or

accounts.

121.     Accordingly, Defendant violated, and unless enjoined will again violate,

Exchange Act Section 13(b)(5) [15 U.S.C. §78m(b)(5)] of the Exchange Act and Rule 13b2-1

[17 C.F.R. §§ 240.13b2-1] thereunder.

### SIXTH CLAIM FOR RELIEF
**False Certifications of Annual and Quarterly Reports –**
**Violation of Exchange Act Rule 13a-14**

122.     The Commission realleges and incorporates by reference paragraphs 1 through

121, as though fully set forth herein.

123.     By virtue of the foregoing, Defendant signed Kubient's third quarter 2020 Form

10-Q certification on November 13, 2020, and Kubient's 2020 Form 10-K certification pursuant

to Rule 13a-14 on March 29, 2021, both of which materially overstated Kubient's revenue, and

falsely certified that those filings fairly presented, in all material respects, the financial condition

and results of operation of the company.

124.     Accordingly, Defendant violated, and unless restrained and enjoined will again

violate, Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14].

### SEVENTH CLAIM FOR RELIEF
**False SEC Filings – Aiding and Abetting Kubient's Violation of Section 13(a) of the**
**Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 Thereunder**

125.     The Commission realleges and incorporates by reference paragraphs 1 through

124, as though fully set forth herein.

126.     By virtue of the foregoing, Defendant provided knowing and substantial

assistance to Kubient, which failed to file or filed current, quarterly, and annual reports with the

SEC which failed to include material information necessary to make the required statements, in light of the circumstances under which they were made, not misleading.

127.    Accordingly, Defendant aided and abetted and, unless restrained and enjoined, will again aid and abet, Kubient's violation of Exchange Act Section 13(a) [15 U.S.C. §78m(a)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13].

### EIGHTH CLAIM FOR RELIEF
**False Books and Records – Aiding and Abetting Kubient's Violation of Exchange Act Section 13(b)(2)(A)**

128.    The Commission realleges and incorporates by reference paragraphs 1 through 127 as though fully set forth herein.

129.    By virtue of the foregoing, Defendant provided knowing and substantial assistance to Kubient, which failed to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the transactions and dispositions of the assets of the issuer.

130.    Accordingly, Defendant aided and abetted and, unless restrained and enjoined, will again aid and abet, Kubient's violation of Exchange Act Section 13(b)(2)(A) [15 U.S.C. § 78m(b)(2)(A)].

### NINTH CLAIM FOR RELIEF
**Internal Accounting Controls – Aiding and Abetting Kubient's Violation of Exchange Act Section 13(b)(2)(B)(ii)**

131.    The Commission realleges and incorporates by reference paragraphs 1 through 130, as though fully set forth herein.

132.    By virtue of the foregoing, Defendant provided knowing and substantial assistance to Kubient, which failed to devise and maintain a system of internal accounting

controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for assets.

133.    Accordingly, Defendant aided and abetted and, unless restrained and enjoined, will again aid and abet, Kubient's violations of Exchange Act Section 13(b)(2)(B)(ii) [15 U.S.C. § 78m(b)(2)(B)(ii)].

## RELIEF SOUGHT

**WHEREFORE**, the Commission respectfully requests that this Court:

### I.

Find that Defendant committed the violations alleged in this Complaint;

### II.

Enter an Injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining Defendant from violating, directly or indirectly, the laws and rules alleged in this Complaint;

### III.

Order Defendant to disgorge all ill-gotten gains received during the period of the violative conduct, plus prejudgment interest thereon, pursuant to the Court's equitable powers, Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and Sections 21(d)(3), 21(d)(5), and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

### IV.

Order Defendant to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

**V.**

Pursuant to the Court's inherent equitable authority, Securities Act Section 20(e) [15

U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)], bar Defendant from

acting as an officer or director of a public company; and

**VI.**

Grant such other relief as this Court may deem just or appropriate.

**<u>JURY DEMAND</u>**

The Commission demands a trial by jury on all claims so triable.

Dated: September 16, 2024.

*s/ Gregory A. Kasper*
Gregory A. Kasper (NY 2735405; SDNY GK6596)
Jodanna L. Haskins (*pro hac vice* application
forthcoming)
Ian J. Kellogg (*pro hac vice* application
forthcoming)
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
1961 Stout Street, 17th Floor
Denver, Colorado 80294
(303) 844-1000
kasperg@sec.gov
haskinsjo@sec.gov
kelloggi@sec.gov
